# United States Court of Appeals
## for the Eleventh Circuit

## Case No. 24-12307-G

---

German Bosque,
Louis Serrano,
Sergio Perez, And
Daniel Kelly,
Defendants/Appellants,

v.

Jafet Castro-Reyes,
Plaintiff/Appellee.

---

On Appeal from the United States District
Court for the Southern District of Florida.
Hon. Kathleen M. Williams, District Judge

---

Corrected Answer Brief of Appellee
Jafet Castro-Reyes

---

Benedict P. Kuehne, B.C.S.
Michael T. Davis, B.C.S.
Board Certified Specialists,
Appellate Practice
Johan Dos Santos
Kuehne Davis Law, P.A.
100 S.E. 2 St., Suite 3650
Miami, FL 33131-2154
Tel: 305.789.5989
Counsel for Appellee

**CERTIFICATE OF INTERESTED PERSONS**

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Eleventh Circuit Rule 26.1-1, appellee Jafet Castro-Reyes certifies the following persons and entities may have an interest in this case:

Bosque, German

Bradford, Gail C.

City of Opa-Locka

Davis, Michael T.

Dean, Ringers, Morgan, and Lawton, P.A.

Dos Santos, Johan

Espino Wydler, Lourdes

Florida League of Cities

Frank Weinberg & Black

Johnson, Anselmo, Murdoch, Piper & Hochman, P.A.

Kelly, Daniel

Kuehne, Benedict P.

Kuehne Davis Law, P.A.

Martin, Lauren D.

McAliley, Chris M., U.S. Magistrate Judge (Retired)

Michael A. Pizzi, Jr., P.A.

Mirabile, Constantina Alexandrou

Pizzi, Jr., Michael A.

Perez, Sergio

Railey, Jonathan H.

Sanchez, Eduardo I., U.S. Magistrate Judge

Serrano, Louis

Slatoff, Robert Todd

Stearns, Jr., Christopher J.

Williams, Kathleen M., U.S. District Judge

Wilson Elser Moskowitz Edelman & Dicker LLP

Wydler Law

## STATEMENT REGARDING ORAL ARGUMENT

Appellee Jafet Castro-Reyes welcomes the opportunity to present oral argument should the Court determine argument would aid the Court's consideration of the issues.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS..................................C1

STATEMENT REGARDING ORAL ARGUMENT...............................i

TABLE OF CONTENTS ................................................................ ii

TABLE OF AUTHORITIES .............................................................. v

STATEMENT OF JURISDICTION ................................................. 1

STATEMENT OF THE ISSUES ...................................................... 2

STATEMENT OF THE CASE AND FACTS....................................... 3

     I.    Factual Recitation ........................................................ 3

          A.    Within ten seconds of entering Castro-Reyes's home, Bosque initiated a seizure of Castro-Reyes by directing he be handcuffed. ..................... 6

          B.    Fifteen seconds after Kelly and Bosque's entry into home, Castro-Reyes asked to be untied. Bosque said no, explaining he was going to handcuff Castro-Reyes. Bosque and Kelly never conducted a Baker Act investigation. ..................... 6

          C.    Serrano arrives and uses forces, after being told by his supervisor to not use force........................... 9

          D.    Perez arrives with Serrano and immediately deploys force against Mr. Valera and then Mr. Castro-Reyes, telling Sergeant Bosque, "Don't f***ing tell me don't do it," when Bosque told him No. .............................................................. 12

          E.    Because it's so wet inside the house, the officers take Castro-Reyes outside................................... 14

     II.    Procedural History ...................................................... 16

STANDARD OF REVIEW ................................................................ 17

SUMMARY OF THE ARGUMENT ................................................ 19

ARGUMENT .................................................................................. 19

    I.    THE COURT LACKS JURISDICTION OVER THIS
        APPEAL. ........................................................................ 19

        A.    Serrano's appeal must be dismissed. ................... 25

        B.    Perez's appeal must be dismissed. ...................... 29

        C.    Bosque and Kelly's appeal must be dismissed. ...... 34

    II.    THE TRIAL COURT PROPERLY DENIED BOSQUE
        AND KELLY'S SUMMARY JUDGMENT MOTION ON
        QUALIFIED IMMUNITY. ............................................... 37

    III.    TRIAL COURT PROPERLY DENIED SUMMARY
        JUDGMENT ON EXCESSIVE FORCE BY SERRANO
        AND PEREZ. ................................................................. 45

        A.    Balancing the nature and quality of the force
            used against the governmental interests at
            stake, a reasonable juror could the find the
            force excessive. ................................................... 47

        B.    All *Graham* factors weigh in Castro-Reyes's
            favor. ................................................................. 49

            1.    Perez and Serrano did not have probable
                cause to believe the detention arose from
                a severe crime. ............................................. 49

            2.    Castro-Reyes did not pose an immediate
                threat to the safety of the officers or others
                .................................................................. 49

            3.    Castro-Reyes did not actively resist his

arrest. He was never told he was being arrested or Baker Acted. Nor did he have the physical or mental capacity to comply. .................................................................. 50

    C.    Under Castro-Reyes's facts, Perez and Serrano violated clearly established law. ........................... 60

IV.   TRIAL COURT PROPERLY DENIED SUMMARY JUDGMENT ON SERRANO'S STATE LAW CLAIM. ......... 66

CONCLUSION ................................................................. 67

CERTIFICATE OF COMPLIANCE .................................. 67

CERTIFICATE OF SERVICE ......................................... 69

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Armstrong v. Ashley*,
  918 F.3d 419 (5th Cir. 2019) ................................................ 21

*Barron v. Fed. Reserve Bank of Atlanta*,
  129 Fed. Appx. 512 (11th Cir. 2005) ...................................... 18

*Behrens v. Pelletier*,
  516 U.S. 299 (1996) ................................................ 22, 29, 30

*Boynton v. City of Tallahassee*,
  650 F. App'x 654 (11th Cir. 2016) .......................................... 62

*Bozeman v. Orum*,
  422 F.3d 1265 (11th Cir. 2005) ............................................. 63

*Bussey-Morice v. Gomez*,
  587 F. App'x 621 (11th Cir. 2014) .......................................... 47

*Callwood v. Jones*,
  727 F. App'x 552 (11th Cir. 2018) ...................................... 46-47

*Cohen v. Beneficial Industrial Loan Corporation*,
  337 U.S. 541 (1949) ........................................................ 20

*Coleman v. Hillsborough Cty.*,
  41 F.4th 1319 (11th Cir. 2022) ............................................. 20

*Digital Equip. Corp. v. Desktop Direct, Inc.*,
  511 U.S. 863 (1994) ........................................................ 22

*English v. City of Gainesville*,
  75 F.4th 1151 (11th Cir. 2023) ............................................. 23

*Fils v. City of Aventura*,
  647 F.3d 1272 (11th Cir. 2011) ............................................. 65

*Flowers v. Renfro*,
  46 F.4th 631 (7th Cir. 2022) ............................................... 36

*Georgia State Conference of NAACP v. Fayette County Bd. of Com'rs,*
    775 F.3d 1336 (11th Cir. 2015) ............................................. 18

*Gordon v. Chattooga County,*
    479 F. App'x 281 (11th Cir. 2012) ........................................ 24

*Graham v. Connor,*
    490 U.S. 386 (1989) ............................................................. 46

*Gray ex rel. Alexander v. Bostic,*
    458 F.3d 1295 (11th Cir. 2006) ............................................ 18

*Hall v. Flournoy,*
    975 F.3d 1269 (11th Cir. 2020) ...................................... 28, 29

*Hawkins v. Carmean,*
    562 F. App'x 740 (11th Cir. 2014) ........................................ 50

*Helm v. Rainbow City,*
    989 F.3d 1265 (11th Cir. 2021) ............................................ 61

*Himmelreich v. Fed. Bureau of Prisons,*
    5 F.4th 653 (6th Cir. 2021) ............................................. 22-23

*Hinson v. Bias,*
    927 F.3d 1103 (11th Cir. 2019) ........................................ 63-64

*Hoyt v. Cooks,*
    672 F.3d 972 (11th Cir. 2012) ............................................. 64

*Ingram v. Kubik,*
    30 F.4th 1241 (11th Cir. 2022) ............................................ 37

*J.W. v. State,*
    313 So. 3d 909 (Fla. 2d DCA 2021) .................................. 40, 43

*Johnson v. Jones,*
    515 U.S. 304 (1995) ....................................................... *passim*

*Jolivette v. Arrowood,*
    180 F. App'x 883 (11th Cir. 2006) ........................................ 25

*K.M. v. State,*

vi

359 So. 3d 414 (Fla. 2d DCA 2023) .................................. 43, 44

*Khoury v. Miami-Dade Cnty. Sch. Bd.*,
4 F.4th 1118 (11th Cir. 2021) ................................. 39

*Koch v. Rugg*,
221 F.3d 1283 (11th Cir. 2000) ............................... 24

*LaChance v. Duffy's Draft House, Inc.*,
146 F.3d 832–35 (11th Cir. 1998) .......................... 18

*Mann v. Taser Int'l, Inc.*,
588 F.3d 1291 (11th Cir. 2009) .............................. 47

*Marantes v. Miami-Dade Cty.*,
776 F. App'x 654 (11th Cir. 2019) .......................... 64

*McMillan v. DeKalb Cty.*,
211 F. App'x 821 (11th Cir. 2006) .......................... 36

*Melendez v. Sec'y of Fla. Dep't of Corr., No. 23-12424*,
2024 U.S. App. LEXIS 20998 (11th Cir. Aug. 20, 2024) .... 24, 28

*Miccosukee Tribe of Indians of Florida v. South Florida Water Management Dist.*,
559 F.3d 1191 (11th Cir. 2009) .............................. 22

*Mills v. Parker*,
379 F. App'x 852 (11th Cir. 2010) .................................. 52, 60

*Mitchell v. City of Jacksonville*,
734 F. App'x 649 (11th Cir. 2018) .......................... 24

*Mitchell v. Forsyth*,
472 U.S. 511 (1985) ........................................ 21, 22

*Mohawk Indus., Inc. v. Carpenter*,
558 U.S. 100 (2009) .............................................. 22

*Neal-Lomax v. Las Vegas Metro. Police Dep't*,
574 F. Supp. 2d 1170 (D. Nev. 2008) ...................... 47

*Nelson v. City of Davis,*
685 F.3d 867 (9th Cir. 2012) ................................................. 46

*Nelson v. Tompkins,*
89 F.4th 1289 (11th Cir. 2024) .............................................. 29

*Oliver v. Fiorino,*
586 F.3d 898 (11th Cir. 2009) ............................................... 62

*Ortega v. Bibb County Sch. Dist.,*
397 F.3d 1321 (11th Cir. 2005) ............................................. 18

*Plaintiff A v. Schair,*
744 F.3d 1247 (11th Cir. 2014) ............................................. 21

*Priester v. Riviera Beach,*
208 F.3d 919 (11th Cir. 2000) ............................................... 63

*Roberts v. Spielman,*
643 F.3d 899 (11th Cir. 2011) ............................................... 37

*S.P. v. State,*
331 So. 3d 883 (Fla. 2d DCA 2022) ........................................ 39

*Shook v. United States,*
713 F.2d 662 (11th Cir. 1983) ............................................... 18

*SmileDirectClub, LLC v. Battle,*
4 F.4th 1274 (11th Cir. 2021) (en banc) ................................. 20

*Teel v. Lozada,*
99 F.4th 1273 (11th Cir. 2024) ............................................. 38

*United States v. Hollingsworth,*
2023 U.S. App. LEXIS 7991 (11th Cir. Apr. 4, 2023) .............. 37

*Vinyard v. Wilson,*
311 F.3d 1340 (11th Cir. 2002) ............................................. 65

*Watkins v. Bigwood,*
797 F. App'x 438 (11th Cir. 2019) .......................................... 39

*White v. Mesa,*
   817 F. App'x 739 (11th Cir. 2020) ........................................... 24

*Will v. Hallock,*
   546 U.S. 345 (2006) ......................................................... 21, 22

*Williams v. City of Daytona Beach,*
   2006 U.S. Dist. LEXIS 5766 (M.D. Fla. Feb. 15, 2006) ............ 63

## Statutes

28 U.S.C. § 1291 ................................................................ *passim*

28 U.S.C. § 1331 ...................................................................... 1

§ 394.459, Fla. Stat. ................................................................ 48

§ 394.463, Fla. Stat. .................................................... 38, 48, 51

## Rules

Eleventh Circuit Rule 26.1-1 ................................................ C1

Rule 26.1, Federal Rules of Appellate Procedure ........................ C1

Rule 32, Federal Rules of Appellate Procedure ........................... 67

## STATEMENT OF JURISDICTION

The district court had jurisdiction. 28 U.S.C. § 1331. As will be more fully discussed, this Court does not have appellate jurisdiction over the district court's order denying summary judgment. *See* 28 U.S.C. § 1291.

# STATEMENT OF THE ISSUES

I. Does this Court have appellate jurisdiction under the collateral order doctrine to review a non-final order denying summary judgment, where the only issues raised on appeal contest the district court's evidentiary sufficiency findings rather than presenting a purely legal question?

II. Did the district court correctly deny summary judgment on the unlawful seizure claim, where genuine issues of material fact existed as to whether the seizing officers had probable cause to initiate an involuntary Baker Act detention?

III. Did the district court properly deny summary judgment on the excessive force claim, where genuine issues of material fact existed as to whether twenty-two taser deployments, multiple facial strikes, and other head strikes constituted excessive force against a non-violent, non-aggressive, and non-resisting individual?

IV. Did the district court properly deny summary judgment on the state-law battery claim, where genuine issues of material fact existed as to whether an officer who laughed after tasering a mentally ill individual twenty-two times acted in bad faith, with malice, or with wanton or willful disregard for the safety of others?

**STATEMENT OF THE CASE AND FACTS**

## I. Factual Recitation

On September 21, 2020, at approximately 3:40 p.m., Defendant-Appellant Sergeant German Bosque responded to a dispatch concerning a "234 domestic" disturbance at the residence of Plaintiff-Appellee Castro-Reyes (DE107-17, MDPD Dispatch1 TS 0:00:11–0:00:20). Dispatch advised that the subject—a potentially violent male—was "possibly high on 52" (DE107-17, MDPD Dispatch1 TS 0:03:53–0:04:03).

Sergeant Bosque arrived by 15:44:05 and was met outside the apartment by Castro-Reyes's cousin, Jose Valera, who was standing near the entrance (DE107-1, Bosque Dep. 22:8–10, 24:4–6; DE107-3, Bosque Video TS 15:44:06–15:44:24). Valera informed Sergeant Bosque that he had tied up his cousin (DE107-3, Bosque Video TS 15:44:05–15:44:58). Upon hearing this, Sergeant Bosque advised over the radio at 15:44:35, "Hold the air a second. They're advising me somebody's tied up inside" (DE107-17, MDPD Dispatch1 TS 0:03:53–0:04:03; DE107-3, Bosque Video TS 15:44:35–15:44:40).

As they walked toward the apartment, Valera explained that his cousin never acts like this and that the family did not know what was

wrong with him (DE107-3, Bosque Video TS 15:44:05-15:44:58). According to Valera, Castro-Reyes had begun damaging his own apartment, and Valera's brother had contacted him to about it (DE107-3, Bosque Video TS 15:44:06–15:44:24; Ex. 21 Translation of Bosque Video TS at 3). Valera explained that his mom and two sisters were inside Castro-Reyes's home (Ex. 21 Translation of Bosque Video TS at 3).

Sergeant Bosque and Officer Kelly reached Castro-Reyes's door that was open. At approximately 15:44:58, they entered the residence (DE107-3, Bosque Video TS 15:44:58–15:45:05). They did not find a violent person. Castro-Reyes lying on the ground, his hands, legs, and ankles bound with electrical wires and cords (DE107-1, Bosque Dep. 23:25–24:1; DE107-5, Kelly Dep. 25:5–9; Ex. 4 Perez Dep. 71:1–3; DE107-3, Bosque Video TS 15:44:55–15:45:00).



It had been raining earlier that day, and Sergeant Bosque was
wearing a raincoat. He later testified that the apartment floor was
completely wet, as were Castro-Reyes and the other individuals
present (DE107-1, Bosque Dep. 23:21–24:1).

As soon as Sergeant Bosque and Officer Kelly stepped inside,
Castro-Reyes told them at around **15:45:00** to leave his apartment
and informed them that they had no permission to be inside his home
(Ex. 3 Video TS 15:45:00-15:45:05; DE107-1, Bosque Dep. 26:25-
27:4; 45:9-11; DE107-2, Serrano Dep. 48:1-9; Ex. 9 Rina Dep. 36:11-
16). Bosque and Kelly did not retreat to the threshold, where they
could continue their conversation with Castro-Reyes (Ex. 3 Video TS
15:45:00 -15:45:05).

## A. Within ten seconds of entering Castro-Reyes's home, Bosque initiated a seizure of Castro by directing he be handcuffed.

Sergeant Bosque and Officer Kelly observed Castro-Reyes for no more than ten seconds after entering the apartment before initiating the seizure at issue (Ex. 3 Video TS 15:45:05–15:45:10). During these ten seconds, Sergeant Bosque and Kelly did not ask Castro-Reyes a single question (Ex. 3 Video TS 15:45:05-15:45:10). They did not inquire about his well-being, nor did they discuss him voluntarily submitting himself for a mental health evaluation under the Baker Act.

Body-worn camera footage confirms that during this encounter, CastroReyes did not display any behavior suggesting a substantial likelihood that, without care or treatment, he would cause serious bodily harm to himself or others in the near future (Ex. 3 Video TS 15:44:55–15:45:10). Castro-Reyes was unarmed, bound with electrical cords, and seated calmly on the ground while asserting his right to be left alone (Id.).

Notwithstanding, at **15:45:06**, Sergeant Bosque ordered Castro-Reyes's handcuffing (Ex. 3 Video TS 15:45:05-15:45:10).

## B. Fifteen seconds after Kelly and Bosque's entry into

**home, Castro-Reyes asked to be untied. Bosque said no, explaining he was going to handcuff Castro-Reyes. Bosque and Kelly never conducted a Baker Act investigation.**

At around **15:45:**10, Castro-Reyes asked Sergeant Bosque to free him, to which Bosque responded he would not, and that Castro-Reyes needed to roll over because Bosque was going to handcuff him (Ex. 3 Video TS 15:45:10-15:45:15). Bosque did not explain the purpose of the handcuffing, much less identify any lawful basis for the seizure (*Id.*). Castro-Reyes was not told he was being arrested or Baker Acted (*Id.*).

At approximately **15:45:21**, Varela informed Officer Bosque that Castro-Reyes was not aggressive and not dangerous (DE107-3, Bosque Video TS 15:45:21-15:45:25; Ex. 8 Varela Dep. 65:9-14). Bosque ordered the cousin to untie Castro-Reyes (Ex. 3 Video TS 15:45:15-15:45:20). Castro-Reyes remained calm while his cousin untied his hands (Ex. 3 Video TS 15:45:15-15:45:20). Bosque admitted in deposition that at no point during law enforcement's attempts to take Castro-Reyes into custody did Castro-Reyes ever attempt to strike any officer (DE107-1, Bosque Dep. 31:12-15).

Then, Bosque instructed Castro-Reyes to turn around so he could place him in handcuffs (*Id.*) As the district court aptly noted, "Based on Defendant Bosque's body-camera footage and statements, it is unclear if Castro-Reyes was physically able to comply with this order." (DE159:4). By Sergeant Bosque's own admission, Castro-Reyes' hands, legs, and feet were bound, and he lay on a wet tile floor (DE107-1, Bosque Dep. at 23:5, 23:22, 28:6–21, 33:9–13.)

When Defendant Bosque asked his name, Castro-Reyes responded, "I am God" in Spanish but continued to lay unmoving on the floor (DE 107-3). At this point, Defendant Bosque declared the situation to be a Baker Act event (DE 98 ¶ 9; DE107-1, Bosque Dep. at 88:15–18). At **15:45:23**, Sergeant Bosque made another announcement for them to "Hold the air a second until we untie him and secure him." (Ex. 3 Video TS 15:45:23-15:45:27; DE107-17, MDPD Dispatch1 TS 0:05:02-0:05:12). After several failed attempts at flipping Castro-Reyes to his back, Officer Bosque called for more backup (Ex. 3 Video TS 15:46:40-15:46:51; DE107-17, MDPD Dispatch1 TS 0:06:16-0:06:23).

As they waited for backup, Varela continued trying to flip Castro-Reyes over, and Defendant Bosque held on to Castro-Reyes'

unhandcuffed hand (DE 107-3). Unable to turn Castro-Reyes over on the slippery floor, and about five minutes after the officers originally arrived, Varela put Castro-Reyes in a chokehold so Defendants Kelly and Bosque could handcuff him (*Id.*). Castro-Reyes continued pleading to be let go and left alone as his face turned red (*Id.*).

### C. Serrano arrives and uses forces, after being told by his supervisor to not use force.

Appellant/Defendant Luis Serano concedes he never received prior dispatch information stating that Castro-Reyes was violent (Initial Br. 8). By his own admission, he responded only to what he described as an emergency call for backup (Initial Br. 8). Still, when he arrived at approximately **15:48:41**, he was informed within a minute—and long before he deployed any force—that Castro-Reyes was a mentally ill, Baker Act candidate (DE107-18, Serrano Video 0:49-0:53).

Citing his affidavit, Serrano asserts in his Initial Brief that when he arrived, he "saw Appellants Bosque and Kelly physically attempting to subdue two males." (Initial Br. 9). The body camera shows otherwise:



To be sure, the district court concluded there was evidence, based on video footage, that when Serano and Perez first arrived, Castro-Reyes was laying on his back, held in a chokehold by Varela, with his hands clasped together in front of his chest when the backup officers arrive (DE159:6).

Upon entry, Serano asked, "Who's the subject." (DE107-18, Serrano Video 0:49). Sergeant Bosque responded, "They helping us. They helping us. That's all they doing. He's a 43." (DE107-18, Serrano Video 0:49-0:53; DE107-3, Bosque Video 6:03-6:10). Forty-three means a mentally ill person: Baker Act (DE107-1, Bosque Dep. 33:23-24).

Defendant Serrano tased Castro-Reyes (DE107-18, Serrano Video 1:34-35). This first tasering lasted for 16 seconds (DE107-18, Serrano Video 1:35-1:52). As soon as the taser connected with his skin, Castro-Reyes spasmed and curled into the fetal position (*Id.*). Multiple officers grabbed Castro-Reyes, pulling his body in various directions, and shouting at him to turn around (*Id.*). As the district court noted, "from the record and video footage, it is unclear if Mr. Castro-Reyes was physically capable of obeying the officers' instructions to flip over on the slippery tile floor given that his legs were completely restrained, various officers were pulling his limbs in different directions, and he had already been tased at least once." (DE159:6).

Serrano repeatedly tased Castro-Reyes, including on his neck (DE107-2, Serrano Dep. 40:16-17; Ex. 3 Video TS 15:50:53-15:54:19; Ex. 4 Perez Dep. 115: 9-10). Officer Serrano estimated he tased Castro-Reyes more than twenty times (DE107-2, Serrano Dep. 71:23-72:1, 75:13-14; Ex. 3 Video TS 15:50:51-15:54:19). His report revealed that he deployed his taser twenty-two times (DE105-4:27-28). Officer Serrano tased Castro-Reyes three to five times within the first thirty seconds of deployment (DE107-2, Serrano Dep. 52:13-

53:9). Officer Serrano has never used his stun gun on the same person more than twice, until Castro-Reyes (DE107-2, Serrano Dep. 25:18-20). Officer Serrano tased Castro-Reyes nonstop from the time he got there, until Castro-Reyes was dragged outside (DE107-2, Serrano Dep. 61:9-13). As the district court remarked on video footage, "In the video footage, Mr. Castro-Reyes appeared to be writhing on the floor though it is unclear whether the motion was due to active resistance on his part or involuntary physical spasms in response to Defendant Serrano's continual use of his taser." (DE159:7).

### D. Perez arrives with Serrano and immediately deploys force against Valera and then Castro-Reyes, telling Sergeant Bosque, "Don't f***ing tell me don't do it," when Bosque told him No.

Defendant-Appellee Sergiou Perez arrived at the same time as Serrano. Perez contends the dispatcher advised the backup officers that Castro-Reyes was potentially violent and resisting arrest, but he does not claim that he received that dispatch (Initial Br. 17). Regardless, within a minute of arrival, Perez (like Serano) was informed before he deployed any force on Castro-Reyes that Castro-

Reyes was a forty-three, mentally ill person (DE107-18, Serrano Video 0:49-0:53; DE107-3, Bosque Video 6:03-6:10).

Although Perez was informed that Valera was helping law enforcement, Perez physically moved Valera from Castro-Reyes (DE107-18, Serrano Video 1:00-:03):



While one officer pressed Castro Reyes's face into the ground and others pinned his body down, Perez punched Castro-Reyes in the face three times with an apparent closed fist (Ex. 4 Perez Dep. 92:5–7; DE107-1, Bosque Dep. 52:6-13). When the Sergeant Bosque told Perez to not punch Castro-Reyes in the face, Perez responded, "Don't f***ing tell me don't do it," to which Perez was again reminded that

Castro-Reyes was a mentally ill person (DE107-3, Bosque Video 8:09-8:23):

| | |
|---|---|
| Sergeant Bosque: | Don't do it. Don't do it. That's not going to help. |
| Serrano: | What do you mean don't f***ing do it? |
| Sergeant Bosque: | Ok. It's not going to help. |
| Serrano: | He's resisting |
| Sergeant Bosque: | I know, but he doesn't know it. He's a 43 [mentally ill person].[1] |
| Serrano: | Don't f***ing tell me don't do it. Turn around. |
| Sergeant Bosque: | He's a 43 LT. |

*(sound of Serrano's taser a second later)*

### E. Because it's so wet inside the house, the officers take Castro-Reyes outside.

In the video footage, Castro-Reyes appeared to be writhing on the floor though it is unclear whether the motion was due to active resistance on his part or involuntary physical spasms in response to Defendant Serrano's continual use of his taser (DE 107-3.) Once

---

[1] Bosque explained that forty-three means a mentally ill person (Ex. 1 Bosque Dep. 33:23-24).

outside, Defendant Serrano continued to tase Castro-Reyes, and Defendant Perez turned to him and said, "No more taser Serrano, that's an order."5 (DE107-1, Bosque Dep. 8.) Still, Defendant Serrano tased Castro-Reyes one last time (*Id.*) Defendant Bosque asked, "Who is tasing?" to which there was no reply (DE 107-3; DE 107-2 at 76:18–20.)

Once outside and handcuffed, Serrano retrieved a hog tie (DE107-18, Serrano Video 7:00-7:07). He then hog-tied Castro-Reyes and cut the leg and ankle restraint put on by his family (DE107-18, Serrano Video 8:57-10:26).

Defendant Perez ordered Defendant Kelly to arrest MC (DE 107-5 at 27:7–28:6.) Defendant Kelly, however, refused to make the arrest due to Castro-Reyes' mental state, asking "what was he going to be arrested for?" (*Id.* at 27:7–18.) Defendant Perez threatened Defendant Kelly saying that "if [Defendant Kelly] did not make the arrest, [Defendant Perez] got something coming for [Defendant Kelly] on the back end." (*Id.* at 28:3–10.) Nonetheless, Defendant Kelly still refused to make the arrest and called the On-Call State Attorney the following day, who advised him that "if [he was] not comfortable with making th[e] arrest, [he did] not have to make the arrest." (*Id.* at 28:11–17.)

Castro-Reyes was never taken to Baker Act facility and there are no records of a Baker Act.

## II.    Procedural History

Castro-Reyes filed a civil rights action alleging multiple violations of federal and state law (DE48). Count I alleged that each officer's warrantless entry into his home violated the Fourth Amendment, as there was neither consent nor exigent circumstances (DE48:9–12). Count II challenged the lawfulness of his seizure, asserting that the officers lacked probable cause (DE48:12–14). Count III presented an excessive force claim, which alleged in part that any force used to effectuate the unlawful seizure of Castro-Reyes was itself unconstitutional (DE48 ¶ 89). Counts IV and V raised state-law claims of false imprisonment, battery, and assault (DE48:19–21). All four Appellants—Bosque, Kelly, Perez, and Serrano—were named in each count.

Following discovery, the parties filed cross-motions for summary judgment (DE99, DE100, DE103, DE109). The district court conducted a thorough review of the record, including extensive body-worn camera footage (DE159). In its detailed order, the court parsed the claims officer-by-officer and claim-by-claim, granting

summary judgment only where it determined no genuine issue of material fact existed.

As to Bosque and Kelly, the district court granted summary judgment on the unlawful entry and excessive force claims but denied summary judgment on the unlawful seizure claim (DE159:37-38). Perez and Serrano were granted summary judgment on the unlawful entry and seizure claims but were denied summary judgment on the excessive force claims (*Id.*). The court also denied summary judgment on the state-law battery and assault claims against Serrano (*Id.*). The district court further declined to grant Castro-Reyes's motion for summary judgment on any issue, including on the issue whether the officers were acting under color of law (*Id.*).

Appellants Bosque, Kelly, Perez, and Serrano seek interlocutory appellate review of the district court's denial of summary judgment on the federal claims. In addition, Serrano challenges the denial of summary judgment on the state-law claim asserted against him.

## STANDARD OF REVIEW

"This court reviews *de novo* the district court's order denying summary judgment, applying the same standards that governed the

district court's decision." *Ortega v. Bibb County Sch. Dist.*, 397 F.3d 1321, 1324 (11th Cir. 2005) (citing *LaChance v. Duffy's Draft House, Inc.*, 146 F.3d 832, 834–35 (11th Cir. 1998)). All issues of material fact are resolved in the plaintiff's favor, and all facts are approached from the plaintiff's perspective. *Gray ex rel. Alexander v. Bostic*, 458 F.3d 1295, 1303 (11th Cir. 2006). "If any fact issues exist a trial judge must not make findings but is required to deny the motion and proceed to trial." *Georgia State Conference of NAACP v. Fayette County Bd. of Com'rs*, 775 F.3d 1336, 1345 (11th Cir. 2015) (quoting *Shook v. United States*, 713 F.2d 662, 665 (11th Cir. 1983)). "The court may not weigh evidence to resolve a factual dispute." *Barron v. Fed. Reserve Bank of Atlanta*, 129 Fed. Appx. 512, 515 (11th Cir. 2005).

## SUMMARY OF THE ARGUMENT

This Court lacks jurisdiction to entertain Appellants' interlocutory appeal under the collateral order doctrine because the district court's denial of qualified immunity rests on genuine disputes of material fact, not legal determinations. Rather than identifying a purely legal issue, Appellants challenge the district court's sufficiency-of-the-evidence findings and seek appellate reweighing of the record. *Johnson v. Jones*, 515 U.S. 304, 309 (1995), expressly prohibits this.

The district court correctly denied summary judgment because a jury could find that Bosque and Kelly lacked probable cause to Baker Act Castro-Reyes. When the officers entered his home, he was unarmed, tied up, calm, and seated on the ground. Sergeant Bosque immediately ordered his seizure within ten seconds—without asking him any questions or asking him to submit to examination. A reasonable juror could find an absence of probable cause.

## ARGUMENT

## I.    THE COURT LACKS JURISDICTION OVER THIS APPEAL.

The Court should dismiss this interlocutory appeal for lack of jurisdiction under the collateral order doctrine. The district court

reviewed the evidence and video footage in the light most favorable to Castro-Reyes and concluded there was sufficient evidence for a jury to find Bosque and Kelly lacked probable cause to Baker Act Castro-Reyes and that Serrano and Prez utilized excessive force (DE159). On appeal, the officers ask this Court to second guess the district court's evidentiary sufficiency rulings. Their arguments rely primarily on facts drawn from their own affidavits, disregarding contrary evidence in the record—particularly the video footage—and ask the Court to displace the district court's evidentiary sufficiency ruling with their own interpretation of the facts. That is not a proper invocation of interlocutory jurisdiction under *Cohen v. Beneficial Industrial Loan Corporation*, 337 U.S. 541 (1949).

As this Court has emphasized, appellate courts "generally only have jurisdiction over appeals from final decisions of the district courts." *SmileDirectClub, LLC v. Battle*, 4 F.4th 1274, 1277 (11th Cir. 2021) (en banc); 28 U.S.C. § 1291. Because an "order denying a motion for summary judgment is not an appealable final order," such rulings are generally not subject to immediate appellate review. *Coleman v. Hillsborough Cty.*, 41 F.4th 1319, 1324 (11th Cir. 2022). "In deference to the district court and to district judges' responsibility

20

to manage trials, interlocutory appeals are only allowed in limited circumstances because they disrupt the progress of a trial." *Armstrong v. Ashley*, 918 F.3d 419, 421–22 (5th Cir. 2019).

Appellants Bosque, Kelly, Perez, and Serrano incorrectly assert that this Court has interlocutory jurisdiction to review the denial of their qualified immunity defenses (Bosque & Kelly Br. at ix; Kelly Br. at 2; Serrano Br. at xii). To be immediately appealable under *Cohen's* collateral order doctrine, the district court's order must "(1) conclusively determine the disputed question, (2) resolve an important issue completely separate from the merits of the action, and (3) be effectively unreviewable on appeal from a final judgment." *Plaintiff A v. Schair*, 744 F.3d 1247, 1253 (11th Cir. 2014) (quoting *Will v. Hallock*, 546 U.S. 345, 349 (2006)). Appellants' claims fail at the second step: they do not identify a legal issue separate from the merits but instead challenge the district court's finding on the sufficiency of the evidence supporting Castro-Reyes's civil rights claims.

The collateral order doctrine, as extended to qualified immunity by *Mitchell v. Forsyth*, 472 U.S. 511, 527 (1985), remains "the exception, not the rule." *Johnson v. Jones*, 515 U.S. 304, 309 (1995).

The Supreme Court has made clear that "determinations of evidentiary sufficiency at summary judgment are not immediately appealable merely because they happen to arise in a qualified-immunity case." *Behrens v. Pelletier*, 516 U.S. 299, 313 (1996) (citing *Johnson*, 515 U.S. at 313–18).

*Mitchell* provides appellate jurisdiction only "to the extent that [the district court's denial] turns on an issue of law." *Mitchell*, 472 U.S. at 530. The doctrine's stringency reflects the Court's concern that an overbroad approach would "overpower the substantial finality interests § 1291 is meant to further . . . ." *Miccosukee Tribe*, 559 F.3d at 1198-99 (quoting *Will*, 546 U.S. at 350); *see also Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 106 (2009) ("[The] doctrine can 'never be allowed to swallow the general rule'") (citation omitted); *Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 873 (1994) (warning that courts must "view claims of a 'right not to be tried' with skepticism, if not a jaundiced eye").

When asked in *Johnson* "to extend *Mitchell* to permit interlocutory appeal of a denial of qualified immunity where the district court had found that there was a genuine dispute of fact," the Supreme Court "declined" to do so. *Himmelreich v. Fed. Bureau of*

*Prisons*, 5 F.4th 653, 662 (6th Cir. 2021). The Court explained that "[t]o take what petitioners call a small step beyond *Mitchell*, [by extending *Cohen* beyond issues of law to issues of evidentiary sufficiency,] would more than relax the separability requirement—it would in many cases simply abandon it." *Johnson*, 515 U.S. at 315. Accordingly, the Court "h[e]ld that a defendant, entitled to invoke a qualified immunity defense, may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." *Id.* at 319–20.

Following *Mitchell* and *Johnson*, this Court has been unequivocal: while the Court has "interlocutory jurisdiction [under the collateral order doctrine] over legal issues that are the basis for a denial of summary judgment on qualified immunity grounds," it "lack[s] interlocutory jurisdiction where the only issues appealed are evidentiary sufficiency issues." *English v. City of Gainesville*, 75 F.4th 1151, 1155 (11th Cir. 2023).

In line with that principle, the Court has repeatedly dismissed appeals in which defendants merely challenge the district court's assessment of whether the record presents triable questions. *See*,

23

*e.g., Melendez v. Sec'y of Fla. Dep't of Corr.*, No. 23-12424, 2024 U.S. App. LEXIS 20998, at *7 (11th Cir. Aug. 20, 2024) (no jurisdiction where "the Defendants' arguments turn entirely on a dispute of the district court's factual inferences, rather than on its conclusions of law"); *White v. Mesa*, 817 F. App'x 739, 742 (11th Cir. 2020) ("Since the appellants' arguments depend on a determination of facts that they may, or may not, be able to prove at trial, we lack jurisdiction."); *Mitchell v. City of Jacksonville*, 734 F. App'x 649, 651-51 (11th Cir. 2018) (finding the court lacked jurisdiction to hear an interlocutory appeal of a district court order denying qualified immunity when defendants' arguments on appeal attack the sufficiency of the evidence); *Gordon v. Chattooga County*, 479 F. App'x 281, 284 (11th Cir. 2012) (same); *Koch v. Rugg*, 221 F.3d 1283, 1298 (11th Cir. 2000) (same).

In *Melendez*, this Court concluded it lacked interlocutory jurisdiction where qualified immunity was denied at summary judgment because, "[a]lthough largely presented under the guise of a legal challenge, the Defendants' arguments turn[ed] entirely on a dispute of the district court's factual inferences, rather than on its conclusions of law." *Melendez*, 2024 U.S. App. LEXIS 20998, at *7.

Likewise, in *Jolivette v. Arrowood*, the Court dismissed a qualified immunity interlocutory appeal where the "defendant supervisors simply disagree[d] with the district court's statement of the facts" and challenged the sufficiency of the evidence. 180 F. App'x 883, 886 (11th Cir. 2006).

That is precisely the posture here. The officers petition the Court to revisit the district court's conclusions about whether the pretrial record contains sufficient evidence for Castro-Reyes's claims to proceed to trial. Because their appeal raises no reviewable legal issue and challenges only the district court's ruling on evidentiary sufficiency, it must be dismissed for lack of jurisdiction.

### A. Serrano's appeal must be dismissed.

Serrano deployed his taser on Castro-Reyes twenty-two times (DE105-4:27–28). At one point, after being expressly ordered to stop—"No more taser Serrano, that's an order"—he deployed it again (DE107-18, Serrano Video). When Sergeant Bosque asked, "Who is tasing?" there was no response (DE107-3, Bosque Video; DE107-2 at 76:18–20). Serrano used his taser with such frequency that he drained its battery—an amount of force he later joked about while laughing with another officer (DE107-18, Serrano Video 8:41–11:30).

Minutes after the final deployment, Serrano was recorded saying, "I think I drained my battery on my Taser," followed by audible laughter from Serrano (DE107-18, Serrano Video 8:41–11:30).

The district court concluded "there remain disputed issues of material fact as to whether using a taser twenty times . . . was reasonable" under the circumstances (DE159:21). Its analysis relies on the "record" evidence showing "Castro-Reyes did not attempt to strike or physically harm anyone at any point during the incident." (DE159:16, 21). On the question of compliance with the police order to turn around, the district court concluded there were genuine issues of material fact as to whether Castro-Reyes was "physically capable of obeying the officers' instructions to flip over on the slippery tile floor given that his legs were completely restrained, various officers were pulling his limbs in different directions, and he had already been tased at least once." (DE159:6). Based on these factual disputes, the district court concluded that "whether Defendant Serrano violated a clearly established right rests on whether the jury believes Mr. Castro-Reyes was mostly cooperative and nonviolent." (DE159:22).

On appeal, Serrano argues he is entitled to qualified immunity

for all twenty-two deployments because, in his view, "Castro-Reyes was not a compliant, nonviolent subject; Castro-Reyes was **actively fighting** the police officers who were called to assist him." (Serrano Br. at 43) (emphasis added). In advancing this claim, Serrano does not accept the facts as found by the district court. Instead, his brief relies entirely on the officers' self-serving affidavits, to the exclusion of the contrary video evidence and factual record on which the district court relied:

> Castro-Reyes was very combative and violently and actively resisted efforts to be handcuffed (Declaration of Daniel Kelly [Doc. 98-2], ¶ 8 and Declaration of German Bosque [Doc. 98-1], ¶ 11.)

Serrano Br. at 7-8.

> After a lengthy, violent struggle with Castro-Reyes, Castro-Reyes was finally handcuffed and put into custody (Declaration of Luis Serrano [Doc. 104-2], ¶ 18.)

Serrano Br. at 11.

This is not a proper invocation of the Court's interlocutory jurisdiction. Serrano's arguments rest entirely on his disagreement with the district court's reading of the factual record. He contends that Castro-Reyes was combative and violent, even though the district court concluded a jury could find that Castro-Reyes was

restrained, largely compliant, and physically incapable of disobeying orders.

In other words, Serrano argues that under his version of the facts, he is entitled to qualified immunity. He does not assert that, even accepting the district court's version of the facts, his conduct was lawful. Serrano's framing of the issue defeats jurisdiction. "There is . . . no question of law for [the Court] to decide because [Serano] only challenge[s] 'the factual inferences that the district court drew from a series of circumstances.'" *Melendez v. Sec'y of Fla. Dep't of Corr.*, No. 23-12424, 2024 U.S. App. LEXIS 20998, at *13 (11th Cir. Aug. 20, 2024) (quoting *Hall v. Flournoy*, 975 F.3d 1269, 1278 (11th Cir. 2020)) (dismissing qualified immunity appeal for lack of jurisdiction).

Serrano's own brief confirms the jurisdictional flaw. He expressly concedes that "Taser use on a compliant, non-violent subject is unreasonable force." (Serrano Br. at 30). That concession mirrors the officer's admission in *Hall*, where the Court concluded: "Because [the officer] admits, as she must, that a police officer who plants evidence violates clearly established law, all we are left with is the factual review of what happened -- was Hall's version of events

right, or was Flournoy's?" *Id*. The same question is presented here: Was Castro-Reyes restrained and largely compliant, or combative and noncompliant? Like, *Hall*, that is not a question of law reviewable by interlocutory appeal under the collateral order doctrine.

Serrano's request for interlocutory appellate review of the denial on summary judgment on battery is similarly misguided. The district court found that the record contained sufficient evidence for a reasonable jury to conclude that Serrano acted in bad faith, with malice, or with wanton or willful disregard for Castro Reyes's rights (DE159:30). Serrano's appeal of this rule does not present a legal issue. Instead, he disputes only the court's conclusion that the evidence could support a finding of misconduct. That is a challenge to evidentiary sufficiency. Such fact-based disagreements do not supply a proper basis for interlocutory appellate jurisdiction.

Because Serrano raises no reviewable legal issue, and instead presents "fact-related disputes about 'whether the evidence could support a finding that particular conduct occurred,'" the appeal must be dismissed for lack of jurisdiction. *Nelson v. Tompkins*, 89 F.4th 1289, 1295 (11th Cir. 2024) (quoting *Behrens* , 516 U.S. at 313).

## B. Perez's appeal must be dismissed.

Lieutenant Perez struck Castro-Reyes in the face three times—force so extreme that a subordinate officer attempted to intervene, telling him, "Don't do it. Don't do it. That's not going to help." (DE107-3, Bosque Video 8:09–8:23). Rather than agree to de-escalate, Perez told the subordinate officer, "Don't f***ing tell me don't do it." (*Id.*). Even Officer Serrano—who deployed his taser on Castro-Reyes twenty-two times and later laughed about it—expressed surprise that Perez had struck Castro-Reyes and would agree with other officers that the force was inappropriate (Serrano Dep. 37:5–16). Minutes later, Perez dragged Castro-Reyes by the pants out of the residence without securing his head, causing his head to strike the steps as he was pulled outside. The Florida Department of Law Enforcement criminally charged Perez with battering Castro-Reyes (Ex. 4 Perez Dep. 10:7-11:3).

After reviewing the record, including video footage, the district court correctly concluded that genuine disputes of material fact precluded summary judgment on Perez's qualified immunity defense (DE159:23).

In his brief, Perez attempts to recast the district court's denial of qualified immunity as a legal error, asserting it arose from a

"misapplication of the undisputed facts" and "critical legal evidentiary errors." (Perez Br. at 23). But even a cursory review of his arguments reveals that Perez raises no legal issue at all. Instead, he asks this Court to second-guess the district court's assessment about the sufficiency of the evidence—precisely the type of challenge that is not reviewable on interlocutory appeal.

Perez in facts concedes the district court concluded a jury could find his use of force unreasonable if it credited Castro-Reyes's version of events—supported by the video evidence—that he was "feeling the aftershocks of a taser, was nonviolent and under control." (Perez Br. at 26). That acknowledgment should end the jurisdictional inquiry. Perez does not contend that his conduct was lawful under those facts. He instead seeks to challenge whether those facts are provable—an interlocutory appellate posture foreclosed by *Johnson.* 515 U.S. 304.

Perez's brief is replete with arguments that reflect nothing more than disagreement with the district court's view of the evidence. He contends the court "erroneously concluded that Castro-Reyes met [his summary judgment] burden," because, in his view, "the record evidence below fail[ed] to create a genuine issue of material fact regarding the objective reasonableness of Perez's physical force."

(Perez Br. at 25). He further disputes the court's finding that the video and other evidence support a factual conclusion that the officers had "control" over Castro, labeling that determination "clearly erroneous." (Perez Br. at 28). These contentions are not legal in nature. They reflect mere factual disagreement, which does not give rise to appellate jurisdiction under the collateral order doctrine.

Perez relies almost entirely on his own deposition testimony and summary judgment affidavit to support his version of events. He asserts that his subjective intent in striking Castro-Reyes was to free his dominant hand (Perez Br. at 6, 22, 23, 30) and goes so far as to claim—incorrectly—that Castro-Reyes does not dispute this intent (Perez Br. at 17). But the district court expressly found that a jury could consider contrary evidence, including Sergeant Bosque's contemporaneous effort to intervene (DE159:23). Perez offers no legal analysis in response—only his own factual counter-narrative, which the district court properly concluded a jury could reject (Perez Br. at 20–21).

Perez's argument regarding the removal of Castro-Reyes from the residence fares no better. He seeks to justify dragging Castro-Reyes by the pants—without securing his head, causing it to strike

the steps—by asserting that Castro-Reyes was noncompliant (Perez Br. at 22). Again, this is a factual claim drawn solely from officer affidavits (Perez Br. at 6). The district court found that a reasonable jury could conclude from the other evidence that. Castro-Reyes was physically incapable of complying, "given that his legs were completely restrained, various officers were pulling his limbs in different directions, and he had already been tased at least once." (DE159:6). To be sure, Serrano's video show law enforcement instructing Castro-Reyes to turn around in the midst of him writing in pain from the sixteen seconds of tasering (DE107-18, Serrano Video 1:46).

Perez's appeal exemplifies an impermissible attempt to dress up a factual sufficiency challenge as a legal one. At its core, Perez asks this Court to reassess the district court's determination of what the evidence may, or may not, establish at trial. He seeks to have the Court credit his testimony, adopt his interpretation of the video, and displace the district court's evidentiary sufficiency ruling. *Johnson* makes clear that such fact-based disputes are not subject to interlocutory appellate review.

Because Perez raises no reviewable legal question, this Court lacks jurisdiction over his appeal. It should be dismissed.

## C. Bosque and Kelly's appeal must be dismissed.

Bosque and Kelly were in Castro-Reyes's home for no more than ten seconds before deciding to Baker Act Castro-Reyes. They asked him no questions—not about his well-being, not about his intentions, and not about whether he would consider voluntary evaluation under the Baker Act. Instead, they relied entirely on the word of a family member and Castro-Reyes's request—while restrained—to be left alone in his own home.

After reviewing the video footage, the district court determined that summary judgment was inappropriate, because a jury could reasonably conclude that Castro-Reyes did not present a substantial risk of serious bodily harm to himself or others—a necessary predicate for involuntary commitment under the Baker Act. *See* § 394.463(1)(b)(2), Fla. Stat. The district court reasoned that "a jury will have to determine whether Castro-Reyes exhibited behavior which justified Defendant Bosque's conclusion that there was a substantial likelihood that without care he would cause serious bodily harm to himself or to others." (DE159 at 17).

On appeal, however, Bosque and Kelly assert that "no jury question exists" as to probable cause, and that "the record is devoid of any evidence" that they violated a clearly established constitutional right or acted incompetently (Bosque & Kelly Br. at 12–13, 16). But these are not legal arguments. They are evidentiary sufficiency arguments grounded in the officers' own version of events. Indeed, their contention that no jury question exists rests entirely on their own affidavits (*Id.* at 16). The district court, by contrast, relied on the contrary evidence presented by Castro-Reyes—including video footage—and concluded that factual disputes remain for jury resolution.

Their brief makes this strategy unmistakably clear. For example, they assert that "Castro-Reyes **combatively** yelled in Spanish 'I AM GOD' as he **kicked, fought**, and exhibited multiple levels of mentally unstable behavior." (Id. at 15) (emphasis added). But this is not drawn from undisputed evidence or Castro-Reyes's version of the evidence; it is based on their own self-serving affidavits. The district court, looking at objective evidence of the very same incident, found that Castro-Reyes was "on the ground with his hands, legs, and ankles tied with electrical wires and cords"

(DE159:4), and that "at no point during the incident did Mr. Castro-Reyes attempt to strike or physically harm anyone." (DE159:17). Bosque and Kelly present factual disagreements—nothing more.

This Court does not resolve such disputes by interlocutory appeal. *McMillan v. DeKalb Cty.*, 211 F. App'x 821, 822 (11th Cir. 2006) ("Issues only of evidentiary sufficiency that are distinct from core qualified immunity issues will support no immediate appeal."). "[A] denial of summary judgment based on a finding of disputed fact does not fall into the narrow exception rendering nonappealable orders reviewable on qualified immunity grounds." *Flowers v. Renfro*, 46 F.4th 631, 636 (7th Cir. 2022). That is precisely the posture here. Bosque and Kelly ask the Court to reject the district court's factual sufficiency ruling, credit their interpretation of the body-worn camera footage, and accept their affidavit testimony as conclusive. That is not a legal issue; it is a challenge to the sufficiency of the evidence, which falls outside the scope of interlocutory appellate review under the collateral order doctrine.

Accordingly, this Court lacks jurisdiction over their appeal. It must be dismissed.

## II. THE TRIAL COURT PROPERLY DENIED BOSQUE AND KELLY'S SUMMARY JUDGMENT MOTION ON QUALIFIED IMMUNITY.

The district court correctly concluded that a reasonable jury could find that Officers Bosque and Kelly lacked probable cause to initiate an involuntary mental health seizure of Castro-Reyes under the Florida Baker Act. Involuntary mental health examinations under Florida's Baker Act must comply with the Fourth Amendment's guarantee against "unreasonable searches and seizures." *United States v. Hollingsworth*, No. 22-11250, 2023 U.S. App. LEXIS 7991, at *8 (11th Cir. Apr. 4, 2023). "Mental health seizures are reasonable under the Fourth Amendment when the officer has probable cause to believe that the seized person is a danger to himself or to others." *Ingram v. Kubik*, 30 F.4th 1241, 1250 (11th Cir. 2022); *see also Roberts v. Spielman*, 643 F.3d 899, 905 (11th Cir. 2011) ("When an officer stops an individual to ascertain that person's mental state (rather than to investigate suspected criminal activity), the Fourth Amendment requires the officer to have probable cause to believe the person is dangerous either to himself or to others.").

Involuntary commitment under the Florida Baker Act is a three-part inquiry. First, there must be probable cause "to believe that the

person has a mental illness." § 394.463(1), Fla. Stat. Second, there must be probable cause to believe that "because of his or her mental illness," either the "person has refused voluntary examination after conscientious explanation and disclosure of the purpose of the examination" or the "person is unable to determine for himself or herself whether examination is necessary." § 394.463(1)(a), Fla. Stat. Under the language of the statute, "[a]n opportunity to refuse voluntary examination is [only] unnecessary if the subject 'is unable to determine for himself or herself whether examination is necessary.'" *Teel v. Lozada*, 99 F.4th 1273, 1286 (11th Cir. 2024). This is "because of the word 'or' in § 394.463(1)(a)." *Id.* Bosque and Kelly's motion fail on this element.

Prior to initiating the seizure, Castro-Reyes was never offered a voluntary examination, nor did he refuse one after a meaningful explanation or disclosure of its purpose. The alternative basis for Baker Act detention offers no refuge here either, as neither Bosque nor Kelly has ever contended that Castro-Reyes was unable to determine for himself whether examination was necessary.

The motion also failed on the third statutory element. There must also be probable cause to believe that "there is a substantial

likelihood that without care or treatment the person will cause serious bodily harm to himself or herself or others in the near future, as evidenced by recent behavior." § 394.463(1)(b), Fla. Stat. The threshold for probable cause for this element is not a low one.

Discussing element three, Florida courts have explained, "[t]he standard for probable cause to take a person into protective custody under the Baker Act is a **high one**; a reasonable belief about 'some likelihood,' 'might cause' 'some kind of bodily harm,' 'at some point in the future,' is not good enough for probable cause to deprive a person of their freedom." *S.P. v. State*, 331 So. 3d 883, 888 (Fla. 2d DCA 2022) (no probable cause to Baker Act where defendant was sitting calmly on a couch being evaluated by EMS, despite his wife reporting concerns about alcohol and anxiety medication use) (emphasis added).

This Court has emphasized that "[v]ague notions about what a person might do—for example, a belief about some likelihood that without treatment a person might cause some type of harm at some point—does not meet this standard." *Khoury v. Miami-Dade Cnty. Sch. Bd.*, 4 F.4th 1118, 1126 (11th Cir. 2021); *Watkins v. Bigwood*, 797 F. App'x 438, 442 (11th Cir. 2019) (quoting Fla. Stat. §

394.463(1)(b)(2)) ("a reasonable belief about 'some likelihood,' 'might cause' 'some kind of bodily harm,' 'at some point in the future' is not good enough for probable cause to deprive a person of their freedom.").

Moreover, Bosque and Kelly may not rely on Castro-Reyes's response to the seizure as retroactive justification for initiating the Baker Act detention. "It should go without saying that behavior that occurred after the initiation of the involuntary evaluation cannot form the justification for that same involuntary commitment." *J.W. v. State*, 313 So. 3d 909, 912 (Fla. 2d DCA 2021) (explaining that "effectuating a Baker Act hold cannot serve as the officer's legal duty if the concern for [the respondent]'s well-being did not arise until after [the respondent] resisted the officer's attempts to physically restrain him").

The district court correctly concluded that a jury could find Bosque and Kelly lacked probable cause to initiate a Baker Act seizure. The central question on summary judgment was whether, at the moment they ordered Castro-Reyes's detention, the officers had probable cause to believe he had posed a substantial likelihood of causing serious bodily harm to himself or others in the near future.

The district court found that this question could not be resolved as a matter of law because the record evidence, viewed in the light most favorable to Castro-Reyes, did not compel the conclusion that such probable cause existed (DE159:17).

That conclusion was well supported. The officers had no more than a fleeting interaction with Castro-Reyes before ordering his restraint. The video footage confirms that Bosque and Kelly were in the home for no more than ten seconds before Bosque ordered Castro-Reyes to be handcuffed (DE107-3, Bosque Video TS 15:45:05–15:45:10). In that brief window, Castro-Reyes exhibited no conduct suggesting he posed an imminent threat. He did not act aggressively, make threats, or attempt to harm anyone. Instead, he calmly objected to the officers' warrantless entry, invoking his constitutional rights (DE107-3, Bosque Video TS 15:44:55–15:45:10).

Bosque admitted in deposition that, at no point in the body-worn footage, did Castro-Reyes attempt to strike anyone (DE107-1, Bosque Dep. 31:9–15). Castro-Reyes was unarmed, partially undressed, and already physically restrained by his family (DE107-1, Bosque Dep. 28:6-13). At most, the officers encountered a young man lying on the ground, subdued and tied up inside his own home—

yet they immediately attempted to take him into custody without any meaningful observation or inquiry.

Bosque and Kelly's summary judgment arguments rely on their affidavits that distort the timeline of when information became available to Bosque and Kelly and are otherwise debunked by available video footage. For example, they claim "the uncontroverted record evidence establishes" they arrived at a "chaotic scene." (Bosque & Kelly Br. at 13). The video footage, however, does not show a chaotic scene. As the district court noted, the video footage shows that when Bosque and Kelly arrived, Castro-Reyes laying down on the ground with his hands, legs, and ankles tied with electrical wires and cords (DE107-1, Bosque Dep. 23:25-24:1; DE107-5, Kelly Dep. 25:5-9; Ex. 4 Perez Dep. 71:1-3; DE107-3, Bosque Video TS 15:44:55-15:45:00):



Bosque and Kelly's summary judgment argument erroneously rely on Castro-Reyes's behavior—which they exaggerate—after they initiated the Baker Act seizure. But they cannot rely on "behavior that occurred after the initiation of the involuntary evaluation." *J.W.*, 313 So. 3d 912. Every alleged act of "erratic behavior," combative behavior, and yelling occurred after they refused to leave his home and initiated the seizure without probable cause.

*K.M. v. State*, 359 So. 3d 414 (Fla. 2d DCA 2023), is instructive. The Second District concluded that there was no probable cause for involuntary commitment under the Baker Act, where law enforcement immediately took the respondent into custody without conducting any significant investigation. The respondent's ex-girlfriend requested a safety check after receiving a text message from the respondent suggesting he may be suicidal. *Id.* at 416. The text message "was a picture of [the respondent] holding a needle with an unknown substance. And [the text] stated, 'This is it. Once you're done reading this, I will be gone.'" *Id.* Law enforcement tracked him down through his cell phone pings and "placed [the respondent] into protective custody **immediately**, handcuffing and searching him." *Id.* at 417. During the encounter, law enforcement conceded the

respondent had "been calm and cooperative and caused Officer Corujo no concern." *Id.* at 417 (emphasis added).

The district court in *K.M.* recognized that the text message demonstrated "some likelihood that some kind of bodily harm might occur at some point in the future had officers not taken defendant into protective custody or searched him." *Id.* at 421. But that was not enough to effectuate an involuntary physical seizure under the Baker Act. *Id.* at 419. In addition, the evidence "d[id] not support a finding that [the respondent] was unable to determine for himself that examination was necessary, as required by subsection (1)(a)2." *Id.* at 420.

Similarly, in the present case, Bosque and Kelly's hurried interaction with Castro-Reyes failed to establish the requisite probable cause for initiating an involuntary commitment. When law enforcement entered Castro-Reyes's home, he was lying on the ground, tied up, and completely subdued. The district court properly concluded there was sufficient evidence for the jury to find an absence of probable cause to detain Castro-Reyes under the Baker Act.

### III. TRIAL COURT PROPERLY DENIED SUMMARY JUDGMENT ON EXCESSIVE FORCE BY SERRANO AND PEREZ.

The district court properly denied summary judgment to Officers Serrano and Perez. Each officer used a substantial amount of force against Castro-Reyes, despite minimal governmental interest in doing so. If the jury accepts Castro-Reyes's facts, Serrano and Perez violated clearly established law.

As to Perez, the Florida Department of Law Enforcement filed criminal battery charges against him arising from this very incident (Ex. 4, Perez Dep. 10:7–11:3). Subordinate officers on the scene contemporaneously believed his actions were excessive. Perez bore the burden on summary judgment to show that no reasonable juror could find his force objectively unreasonable. He did not come close to meeting that burden.

Serrano similarly failed to meet his burden. He discharged his taser against Castro-Reyes twenty-two times during the encounter (DE105-4:27–28). At one point, after being given a direct order—"No more taser Serrano, that's an order"—he continued to deploy it (DE107-18, Serrano Video). Minutes later, Serrano told another officer, "I think I drained my battery on my Taser," followed by audible

laughter (DE107-18, Serrano Video 8:41–11:30). Considering the full record, the district court correctly concluded that a jury could find the force used by Serrano was excessive under the Fourth Amendment.

Excessive force claims are governed by *Graham v. Connor*, 490 U.S. 386, 394-95 (1989), which requires courts to weigh the nature and quality of the force used against the governmental interests at stake. Courts must consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [he] is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. Where the governmental interest is slight, even minimal force may be unconstitutional. *Nelson v. City of Davis*, 685 F.3d 867, 878 (9th Cir. 2012).

Perez and Serrano were confronted by a non-violent person having a mental episode, facts that are quite different from cases in which this Court found the use of taser on person experiencing mental health crises reasonable. *Callwood v. Jones*, 727 F. App'x 552, 555 (11th Cir. 2018) (thirteen taser deployment reasonable on a mental health detainee who began to "resist violently" and wrestle

with law enforcement); *Bussey-Morice v. Gomez*, 587 F. App'x 621, 624 (11th Cir. 2014) (three taser deployments reasonable, where mental health detainee took a threatening stance and was kicking and fighting); *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306 (11th Cir. 2009) (taser deployment reasonable where person's "conduct was violent and extended").

A. **Balancing the nature and quality of the force used against the governmental interests at stake, a reasonable juror could find the force excessive.**

The force employed by both officers was severe. Serrano deployed twenty-two taser applications in rapid succession over approximately three minutes, including a single uninterrupted deployment lasting sixteen seconds (DE105-4). This was substantial. See *Neal-Lomax v. Las Vegas Metro. Police Dep't*, 574 F. Supp. 2d 1170, 1185 (D. Nev. 2008) (finding that five taser deployments in short succession—one lasting eight seconds—constituted "substantial force"). Perez struck Castro-Reyes in the face three times while he was pinned down by multiple officers, and later dragged him out of the home without securing his head, causing it to strike the steps. This was also substantial.

The governmental interest in using this degree of force against

Castro-Reyes was minimal to nonexistent. He was already physically restrained when Officers Serrano and Perez arrived and remained restrained throughout the encounter. The stated justification for the use of force—to reposition him in order to apply law enforcement-issued restraints for Baker Act transport—did not support the level of force employed on a nonviolent, mentally ill individual.

Florida law reflects this principle. "It is the policy of this state that the individual dignity of the patient shall be respected at all times and upon all occasions, including any occasion when the patient is taken into custody, held, or transported." § 394.459(1), Fla. Stat. In that same spirit, "[r]estraining devices utilized for criminals or those accused of crime shall not be used in connection with persons who have a mental illness, **except for the protection of the patient or others.**" § 394.459(4)(a), Fla. Stat. And where law enforcement initiates an involuntary examination, Florida law requires that "a law enforcement officer transporting a person pursuant to this section shall restrain the person in the least restrictive manner available and appropriate under the circumstances." § 394.463(2)(a)2.

Here, the officers used force not to protect anyone from injury,

but to facilitate a procedural handcuffing for transport. That is not a lawful justification under Florida law, and certainly not one that could support the degree of force used.

**B.    All *Graham* factors weigh in Castro-Reyes's favor.**

### 1.    *Perez and Serrano did not have probable cause to believe the detention arose from a severe crime.*

The *Graham* factors weigh in Castro-Reyes's favor, beginning with the first: the severity of the crime. There was none. Castro-Reyes had committed no offense, and both Serrano and Perez were aware of that fact. They arrived on scene within moments of each other, and within a minute of their arrival—before either deployed any force— they were informed that Castro-Reyes was a "forty-three," a radio code indicating a mental health emergency requiring a Baker Act intervention (DE107-18, Serrano Video 0:49–0:53; DE107-3, Bosque Video 6:03–6:10; DE107-1, Bosque Dep. 33:23–24).

### 2.    *Castro-Reyes did not pose an immediate threat to the safety of the officers or others.*

Second, Castro-Reyes posed no immediate threat to the safety of the officers or others. At no point did he punch, kick, strike, or attempt to punch, kick, or strike an officer (DE107-1, Bosque Dep. at 44:24-45:5; DE107-3, Bosque Video, DE107-18, Serrano Video).

His legs and ankles remained restrained throughout the encounter (DE107-3, Bosque Video 11:33). Even after his hands were untied at Sergeant Bosque's instruction, Castro-Reyes did not use them to strike, push, or threaten any officer. The video footage confirms that, over the course of the ten-minute use-of-force incident, Castro-Reyes never attempted to use his hands offensively (DE107-3, Bosque Video; DE107-18, Serrano Video). The district court properly noted, "It is also undisputed that at no point did Mr. Castro-Reyes attempt to strike any of the responding officers." (DE159:21).

The second *Graham* factor therefore also weighs in his favor.

### 3. *Castro-Reyes did not actively resist his arrest. He was never told he was being arrested or Baker Acted. Nor did he have the physical or mental capacity to comply.*

As to the third factor, the record supports the district court's conclusion that Castro-Reyes was not actively resisting in the constitutional sense.

As a threshold matter, the record is devoid of any evidence that Castro-Reyes was told he was under arrest or being Baker Acted. This fact matters. In *Hawkins v. Carmean*, 562 F. App'x 740, 743 (11th Cir. 2014), the officer did not have a reasonable belief that the

arrestee was resisting arrest or otherwise refusing to comply, where she was never told that she was under arrest.

Furthermore, as the district court correctly recognized, there was sufficient evidence from which a reasonable jury could find that Castro-Reyes was neither mentally nor physically capable of complying with the officers' commands (DE159:19).[2]

To begin, Castro-Reyes was suffering a mental health crisis so severe that Sergeant Bosque determined involuntary examination was required. Under the Baker Act, that determination necessarily reflects a finding that Castro-Reyes lacked even the capacity to assess whether an examination was necessary. *See* § 394.463(1)(b)(2), Fla. Stat.[3] There is ample record evidence that Castro-Reyes was not in control of his mental faculties. Bosque and Kelly acknowledged as much during their depositions (DE107-1,

---

[2] For purposes of an excessive force analysis, Castro-Reyes is required to assume the officers were making a lawful Baker Act.

[3] The record reflects that law enforcement never asked CastroReyes to voluntarily submit an examination, and he never refused after conscientious explanation, which necessarily means they determined his mental illness was so strong that even Castro-Reyes lacked the mental acuity to determine if examination was necessary. § 394.463(1), Fla. Stats.

Bosque Dep. 50:1–14; Ex. 5, Kelly Dep. 35:1–9). As the officers began using force, Castro-Reyes was heard saying, "I am God"—a statement consistent with the officers' belief that he was delusional (DE107-8, Valera Dep. 37:12–19). Sergeant Bosque is even recorded on his body-worn camera telling other officers, "He doesn't know he's resisting." (DE107-3, Bosque Video 8:12–8:18). A jury could reasonably find that Castro-Reyes's conduct was the product of severe mental illness, not intentional resistance.

In *Mills v. Parker*, 379 F. App'x 852 (11th Cir. 2010), this Court affirmed the district court's conclusion that the jury could find the arrestee was not passively resisting arrest by failing to show his hands upon command, where the arrestee did not hear the officers' commands because he was sleep due to an overdose on Xanax. The Court concluded that "gratuitous use of force when a criminal suspect is not resisting arrest constitutes excessive force." *Id.* at 854.

In addition to his mental state, the district court found that Castro-Reyes may have been physically unable to comply (DE159:19). The video evidence shows at least six officers surrounding Castro-Reyes, pulling and pushing his limbs in conflicting directions (DE107-18, Serrano Video at 2:29). At the point

where Serrano began tasering, an officer in a white shirt attempted to rotate Castro-Reyes counterclockwise to position him for handcuffing. That effort was futile because another officer, holding the handcuff already placed on Castro-Reyes's right arm, was simultaneously pulling him in the opposite direction (DE107-18, Serrano Video 1:32):





The district court rightly observed that a jury could find Castro-Reyes was not resisting, but rather being physically manipulated by multiple officers in a chaotic and uncoordinated manner.

Bosque's body-worn camera shows this same moment from a different angle: one officer attempting to rotate Castro-Reyes clockwise while another pulled his arm (holding the handcuff on his right hand) in the opposite direction (DE107-3, Bosque Video 6:43):







Within seconds of this confusion, Castro-Reyes was slammed to the ground, and Officer Serrano immediately deployed his taser for an uninterrupted sixteen-second burst (Bosque Video 6:47–6:57). As Castro-Reyes's body spasmed from the electrical shock, officers continued to yell at him to "turn around." Four officers then grabbed different limbs and pulled in opposing directions—all while Castro-Reyes remained physically restrained and overwhelmed (DE107-18, Serrano Video at 1:43–1:53). Every one of Serrano's twenty-two taser deployments occurred under these circumstances. The district court correctly concluded that this evidence created a triable issue as to whether Castro-Reyes was physically capable of complying with

commands and resisted by failing to comply.

Perez's force was no more justified. At the time he struck Castro-Reyes in the face, Perez's right hand was holding one of the handcuffs attached to Castro-Reyes's right hand and had previously had his left hand on Castro-Reyes's forehead (DE107-3, Bosque Video at 7:57). Three other officers were simultaneously restraining his body (DE107-3, Bosque Video at 7:57-8:07; DE107-18, Serrano Video 2:54):



Despite the overwhelming physical control already applied, Perez struck Castro-Reyes three times in the face (Bosque Video 8:07–8:08).





Perez now falsely claims this force was necessary to free his dominant hand (Perez Br. at 17). The district court properly rejected that justification. When confronted in real time by a fellow officer—

"Don't do it. That's not going to help"—Perez did not say he was trying to free his hand. Instead, he replied, "Don't f***ing tell me don't do it. . . . . He's resisting." (DE107-3, Bosque Video 8:09–8:23). A jury could reasonably reject his *post hoc* justification.

Perez's subsequent decision to drag Castro-Reyes by the pants without securing his head was also unreasonable (DE107-18, Serrano Video 4:03-06):



Although he claims he believed Castro Reyes's head was secured (Perez Br. at 7), he was expressly warned to watch the head, ignored that instruction, and Castro Reyes's head struck the metal threshold (DE107-3, Bosque Video at 9:17):



Perez concedes that Castro-Reyes's head ultimately hit the steps (Perez Br. at 7). While Castro-Reyes briefly held on to the doorframe to resist being pulled down the concrete stairs without his head secured, Perez concedes his hold on the door lasted only four or five seconds (*Id.*). The district court correctly held that a reasonable jury could find for Castro-Reyes on this third *Graham* factor.

### C. Under Castro-Reyes's facts, Perez and Serrano violated clearly established law.

Under Castro-Reyes's version of the facts, Officers Perez and Serrano violated clearly established law prohibiting excessive force against nonviolent individuals, particularly in the mental health

context. They do not argue that their conduct would be lawful even if the district court's factual determinations are credited—conceding, in effect, that their appeal hinges on factual disputes, not legal questions. Controlling Eleventh Circuit precedent makes clear that using substantial force—such as repeated taser deployments or facial strikes—on individuals experiencing medical or mental health emergencies who pose no threat violates clearly established Fourth Amendment rights.

In *Helm v. Rainbow City*, 989 F.3d 1265 (11th Cir. 2021), the plaintiff was suffering a medical emergency—seizures that rendered her unable to control her body. Responding officers were already holding her down when a back-up officer arrived, unaware she was experiencing a medical crisis. Believing she was merely "out of control," the officer shouted at her to calm down and threatened to tase her. Despite the fact that she was pinned down by several officers and physically incapable of complying, he tased her three times. *Id.* at 1269–70. The officer later argued he was justified because the plaintiff was "incapable of making a rational decision," had "at best only a tenuous grasp on reality," and was not "fully secured." *Id.* at 1273.

The Court rejected the defense and denied qualified immunity, holding that tasering a non-threatening, medically compromised individual—incapable of compliance—was clearly excessive.

*Oliver v. Fiorino*, 586 F.3d 898 (11th Cir. 2009), is likewise instructive. There, officers tased an individual more than eight times without warning. The Court emphasized that "[t]he need for force was exceedingly limited," where the individual was not suspected of any crime, was not aggressive, complied with officer instructions, and made no effort to flee. *Id.* at 905, 908.

In *Boynton v. City of Tallahassee*, 650 F. App'x 654 (11th Cir. 2016), the Court reaffirmed *Oliver*, describing it as addressing "the reasonableness of an officer's repeated use of a taser on an individual who was not accused of any crime; who did not pose an immediate threat to the officer or others; who was not belligerent or aggressive; and who was not trying to flee or evade arrest." *Id.* at 660. In *Boynton*, the patient—originally described as combative—was calm when officers arrived. The only "resistance" observed was momentary tensing as the patient was repositioned on a stretcher. Nevertheless, the officer deployed his taser nine times. The Court held that repeatedly tasing a nonviolent, compliant medical patient was clearly

excessive.

The same principle governs here. Castro-Reyes was unarmed, nonviolent, and not suspected of a crime. He did not flee, did not strike an officer, and remained physically restrained throughout the incident. Nevertheless, he was tasered twenty-two times, struck in the face multiple times while pinned to the ground, and dragged by the pants so forcefully that his head struck concrete steps. This degree of force, applied to a subdued individual in psychological crisis, far exceeds what the Constitution permits. *See, e.g., Bozeman v. Orum*, 422 F.3d 1265, 1272 (11th Cir. 2005); *see also Priester v. Riviera Beach*, 208 F.3d 919, 92324 (11th Cir. 2000) (finding excessive force when the officers let their dog attack the plaintiff and threatened to use a gun, even though the plaintiff was already on the ground in response to the officers' commands); *Williams v. City of Daytona Beach,* No. 6:04-cv-1879-Orl-19KRS, 2006 U.S. Dist. LEXIS 5766, at *14, 17 (M.D. Fla. Feb. 15, 2006) (finding excessive force where the officers pushed, choked, and jumped on top of the plaintiff *after* he was handcuffed and did not resist the officers).

Perez and Serrano's reliance on criminal-arrest precedents is misplaced. *E.g.*, *Hinson v. Bias*, 927 F.3d 1103, 1120 (11th Cir. 2019)

(the arrestee apparently stabbed a man to death, without provocation); *Marantes v. Miami-Dade Cty.*, 776 F. App'x 654, 665 (11th Cir. 2019) (force on a suspect arrested for battery on a law enforcement officer and resisting arrest with violence); *Hoyt v. Cooks*, 672 F.3d 972, 978 (11th Cir. 2012) (force reasonable on a non-mental health person who "had just recently committed assault and battery on a police officer by lunging through the patrol car window and grabbing the officer's shirt while threatening to kill him").

Unlike the defendants in *Hinson*, *Marantes*, and *Hoyt*, Castro-Reyes was not suspected of any offense. He was not under arrest (Serrano Dep. 19:17–18). He was being transported for involuntary mental health evaluation under Florida's Baker Act—a context in which the governmental interest in using force is materially lower. While bracing and tensing may constitute "active resistance" and sometimes justify force under *Graham*, courts assess the resistance in light of the governmental interest at stake. In the criminal context, officers have a greater interest in using substantial force to subdue a suspect engaged in non-violent, but active resistance of a lawful criminal arrest. But in the context of a Baker Act seizure, that rationale does not hold.

Florida law anticipates that individuals suffering a mental health medical emergency may refuse help—that is why the statute authorizes officers to involuntarily take the person to a facility. *See* § 394.463(1)(b)(2), Fla. Stat. Treating the non-violent, reflexive resistance often associated with involuntary commitment—such as the bracing or tensing exhibited by Castro-Reyes—as justification for facial strikes or twenty-two taser deployments defies logic and law. As Sergeant Bosque candidly observed in real time, Castro-Reyes was not in his right mind, and the use of force was not going to help. It did not serve any protective purpose. It was purely punitive.

Still, even in the absence of a case directly on point, the unlawfulness of beating, dragging, and repeatedly tasing a non-dangerous, non-violent mentally ill individual—who is restrained, non-aggressive, and not committing any crime—is "so obvious" that "qualified immunity will not protect [an officer]," *Fils v. City of Aventura*, 647 F.3d 1272, 1291 (11th Cir. 2011) (quoting *Vinyard v. Wilson*, 311 F.3d 1340, 1355 (11th Cir. 2002)). The district court correctly denied summary judgment.

## IV. TRIAL COURT PROPERLY DENIED SUMMARY JUDGMENT ON SERRANO'S STATE LAW CLAIM.

Serrano also contends there is insufficient evidence that he acted in bad faith, with malice, or with wanton or willful disregard for Castro-Reyes's rights (Serrano Br. at 26-35). The district court correctly concluded there were, at a minimum, triable issues of fact.

Serrano deployed his taser on Castro-Reyes twenty-two times (DE105-4:27–28). At one point, after being expressly ordered to stop—"No more taser Serrano, that's an order"—he deployed it again (DE107-18, Serrano Video). When Sergeant Bosque asked, "Who is tasing?" there was no response (DE107-3, Bosque Video; DE107-2, Serrano Dep. at 76:18–20). Serrano used his taser with such frequency that he drained its battery—an amount of force he later joked about while laughing with another officer (DE107-18, Serrano Video 8:41–11:30). To be sure, minutes after the final deployment, Serrano was recorded saying, "I think I drained my battery on my Taser," followed by audible laughter from Serrano (DE107-18, Serrano Video 8:41–11:30). Castro-Reyes was non-violent. He was restrained. Serrano knew he was a Baker Act candidate who was accused of no crime and did not have full awareness of his

surroundings. The district court correctly concluded that a reasonable juror confronted with these facts could concluded he acted in bad faith, with malice, or with wanton or willful disregard for Castro-Reyes's rights.

## CONCLUSION

For these reasons, this Court should affirm the order denying summary judgment.

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure. This brief is printed in Bookman Old Style 14-point font and contains 11,224 words, as counted by MS Word.

Respectfully submitted,

*S/ Benedict P. Kuehne*
**BENEDICT P. KUEHNE**
Florida Bar No. 233293
**MICHAEL T. DAVIS**
Florida Bar No. 63374
**JOHAN DOS SANTOS**
Florida Bar No. 1025373
**KUEHNE DAVIS LAW, P.A.**
100 S.E. 2 St., Suite 3650
Miami, FL 33131-2154
Tel: 305.789.5989
Fax: 305.789.5987

ben.kuehne@kuehnelaw.com
efiling@kuehnelaw.com

**CERTIFICATE OF SERVICE**

I CERTIFY that on March 25, 2025, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record either via transmission of Notices of Electronic Filing generated by CM/ECF or in another authorized manner for those counsel or parties not authorized to receive electronically Notices of Electronic Filing.

By: *S/ Benedict P. Kuehne*
**BENEDICT P. KUEHNE**